Case number 24-5153 Academy of Allergy and Asthma and Primary Care v. Amerigroup Tennessee Incorporated et al. Oral Arguments. 15 minutes for plaintiff, 15 minutes to be shared by defendants. Mr. Clement, you may proceed for the appellant. Good morning. Good morning, your honors. It may please the court. Paul Clement for the appellants. I'm going to be dividing argument with Mr. Lowe. I'm going to handle the antitrust issues. He's going to handle the state law issues. But, of course, we'll both be ready to respond to any questions you have. And I'm going to endeavor to save four minutes for rebuttal. The antitrust claims here were dismissed for the most unlikely of reasons, that the direct target of a group boycott lacks antitrust standing to sue the alleged conspirators. That holding is unprecedented and wrong. Indeed, the Supreme Court and Associated General Contractors made clear that while the unions could not be sued, that was in large measure because the directly targeted union firms could sue. And so the union's injuries were indirect. As the district court in the Fifth Circuit version of this case held, and as Judge Oldham reinforced at Oral Argument a couple of weeks ago, the plaintiffs here are directly analogous to the union's firms in AGC. The issue should really be that straightforward. The district court reached a different conclusion by applying a five-factor test. I'm tempted to say that shows the dangers of a five-factor test. Do you think there's room for reassessing the appropriateness, the appropriate law here? So Wexmark said prudential standing is gone. Maybe there's something called statutory standing. But the better way to think about it is kind of a zone of interest test and approximate cause test. And I could see the two types of antitrust problems here matching on to zone of interest and approximate cause. Zone of interest would be, is it a type of harm that the antitrust laws were about? And approximate cause being like the Illinois brick problem. So that would be an ambitious project. I think it's within the sort of ken of this court to embark on that project. I would find this case a little bit of an odd vehicle to embark on that project just because I think this is such a straightforward case. There literally isn't a case where the direct target of a group boycott is poured out on antitrust standing. But what if it's, what if you just think about it as Illinois brick? Illinois brick isn't a multi-factor test. I mean it leads to multi-factor tests. You could argue it's the main source of the multi-factor test. But what if we just call it an Illinois brick problem? Well, it's not an Illinois brick problem. And Illinois brick is not the source of the five-factor test. The source of the five-factor test, if you go all the way back to South Haven... Let's just put the five-factor test to the side. Let's just focus on Illinois brick. Sure. We're not an indirect purchaser. We're not an indirect purchaser. We're the direct target of the boycott. So we're miles away from Illinois brick. Think of this hypothetical. So I would prefer, the problem here is it's a monopsony, not a monopoly or whatever you want to call it. It's consumers. But what if you, your client, United Allergy, and a company that did the exact same thing, just a hypothetical company. What if they entered into a horizontal cartel and they set prices for doctors and their contracts with the doctors? Prices went up with the doctors. The doctors are like, our costs are higher. We're going to have to go to the insurers and ask for more money. I know price is sticky, but assume that happened. Would you think that that would be an Illinois brick problem if the insurers sued your client? I mean, I think it might be because in that kind of indirect purchaser case, the sort of injury of the downstream or upstream, the insurer, is entirely derivative of the injury that the doctor suffers. But that's not the case in a case like this where you can think about this as a secondary boycott directed at UAS and the doctors may be injured too. But they're completely separate injuries and we are the direct target of the boycott. And there's just no case on the planet that says that you don't have antitrust standing to sue in those circumstances. And it's a remarkably straightforward case. It would be straightforward. It's obvious to me. I mean, that hypo, does it not matter that the contracting parties here are the insurers and the doctors? I don't know what the contractual relationship between the doctors and United Allergies was, but assume that United Allergies had said, give us 20% of anything you get from the insurers. And so it's essentially a pass-through of 20%. The insurers harming the doctors, they don't get their 20%. What's wrong with thinking of that as just Illinois brick in the opposite direction? Because it wouldn't be. I mean, look, it wouldn't be an Illinois brick problem. If you have something where you've got two people and the way they price their product is that they have two components and then there's some price fixing, both contributors to the components get to bring their suit. Because one of them isn't just directly derivative of the other one. So if you have a supplier, though, of a phone that is a product of the phone and the phone passes on like it's a component of the phone and then you sell the phone, you'd only sue the phone company as the only one who could sue the cartel of the supplier. That might be right, but that's because the injury there is entirely derivative and it's a classic supplier injury. But it's a different context when you boycott a supplier because the supplier is the competitive force in the market. And all of a sudden there's a new supplier on the market that's disrupting the market. And if you go after that supplier directly, not just a derivative injury, which I think is what you had in like static control, where it was just a derivative injury. But you're going directly at them. You absolutely have standing. And if it's helpful to the court, I would direct you to the decision of Judge Friendly, who, as usual, is directly on point. And it's Krimper's promotions against HBO. Didn't cite it in the brief, but I found it in preparing for the argument. It's 724F290. It's a great case. It's somebody who is a new disruptive force in the market. Traditionally, HBO just sort of dealt with the producers of the show. And all of a sudden this guy came up with the idea, I'm going to disrupt this market by having a trade show where all of the different producers of shows can show up. And as a result of that, it's going to sort of effectively eliminate the power that HBO and Showtime had over the market. HBO and Showtime get together. They agree with each other to squelch this show. And Judge Friendly looks at this and says, there's absolutely standing here. And if I could just close with a quote from him, because it shows exactly the mistake the district court made. You get into this five-factor nonsense and you can lose sight of the forest for the trees. And what Judge Friendly says, indeed, if we should free ourselves from the miasma of adjectives that have accumulated around the words of Section 4, this case would seem to be a paradigm of standing. That's this case. Thank you, Your Honors. I have a question. And this might sort of provide a concrete example of the concerns that are reflected in the questions you've heard about Illinois brick. Let's say this case was just about a single transaction where, let's say, Amerigroup denies reimbursement to a particular doctor who had contracted with UA. And so the doctor gets stiffed. And as a result, UA doesn't get some payment from the doctor that it's supposed to get. So the doctor, in the initial instance, absorbs the entire loss. UA has a follow-on loss, but that is, in a sense, indirect. And UA's loss is subsumed within the doctor's loss. So the concern there is, as to the Illinois brick issue, that UA, number one, its injury is indirect. As measured by the action of the defendant, number one. And number two, derivative might not be the best way to talk about it. Duplicative seems to be the concern in Illinois brick. And if both plaintiffs recovered the full amount that they were entitled to in the normal course of transaction, there would be an excessive duplicative recovery because UA's amount is actually part of the doctor's loss. And so that could give rise to an Illinois brick concern, albeit in a supplier context rather than a purchaser one. And so why are we not bound, I guess would be one question, or why should we say that Illinois brick is nonetheless inefficient? So a couple of things. There's no fear of duplicative recovery here. I mean, the doctor loses whatever its lost profits are on not being able to recover. Not being able to offer allergy services. We lose our lost profits. So they are not duplicative at all. They are not duplicative at all. Okay. We'll keep doing that. I want to circle back to that. Okay. They are not duplicative at all. That's not my hypo. I think that would be for future profits, but go ahead. The question is friendly for what it's worth. Well, I mean, you may think so. I mean, I don't think the recoveries here are duplicative at all. And I don't think there's an Illinois brick problem at all. And keep in mind, the last word on Illinois brick is pepper. And what pepper says is, hey, if there's a tie, the tie goes to the text of Section 4, and Section 4 doesn't say anything about this stuff. Now, the other thing I would say, though, is, I mean, I realize it's a hypo. And I think what distinguishes the hypo, if it's, like, if the only focus is that contractual relationship or the one-time transaction, I mean, you know, maybe it's, I think it's a slightly harder case, which is why I'm not processing this as the friendliest question I've ever gotten. But to me, you know, even one of the five factors you look to is the intent. And when the intent is... And the last thing I would say... If you're really worried about indirect plus duplicative recovery, one could make an argument as to, you know, in a retrospective instance where care is already provided, they get stiffed, not future profits. But just to contextualize this, I mean, duplicative recovery is not, like, some standalone block. And I don't think the recoveries here are duplicative. And to me, like, look at McCready, right? Like, nobody thought the psychologist couldn't sue, and yet they let McCready sue. So... Just want to change a little bit. I want to have you tell me, just make sure I'm understanding something. So you say you can't rely on the doctors to sue here, they're not going to bite the hand that feeds them. You know, one response to that is that's why they have trouble damages, and if trouble's not enough for incentives, make it, you know, 10 times, but whatever. But I do want to ask you, if the doctors had filed this lawsuit, what would have left you short, your clients short? So in other words... All the money we make in Tennessee. So just finish it out. So the doctors sue, they say this is outrageous, blah, blah, blah. And then there's a contractual relationship between the doctors and your clients. So just explain to me why they would not recover. I just want to make sure I'm getting it. It's probably simple, but I just want to make sure I understand it. So can, I mean, I'll try to give it to you. I was going to try to use, like, a different hypo to try to explain it. But, like, you know, the doctors are going to make, like, a relatively small amount of profits when they, you know, provide these services. They would have charged 20% more, because they would have been adding something they weren't able to provide before, because they didn't have people that could go to the homes and give them money. So now it's an additional service. They get additional compensation. And I can't understand why that doesn't pick up all the losses of your client. That's what I'm trying to figure out. Because we're making profits, you know, we're making, like, let's think of it as, like, a single vial of medicine. And let's say, like, we sell it as the manufacturer of the drug to the doctor. The doctor then, like, you know, a lot of these buy and build drugs, if you're familiar with that. Like, the manufacturer makes it. It's, like, an expensive vial for, like, you know, eyes or something. You sell it to the doctor. You sell it for 1,000 bucks. The manufacturer makes 200 bucks on that vial. The doctor administers it and reimburses it. And the doctor might make $10 for the process of administering the drug and billing it. So the doctor can recover his $10 loss. But that does nothing for the $200 loss the manufacturer would have in lost profits for not being able to sell in this market. And there's no difference between this case and a case about a drug manufacturer. Like, in every case, it's just the nature of this market. Are these claims ever brought where the doctors and UAS would sue together? In other words, that's a way to get around the standing problem. You don't just drop out UAS because, obviously, the doctors clearly have standing. They clearly have a direct injury. Is that a way the problem would get solved? I know it didn't happen, but I'm just trying to figure it out. I don't think there's a problem to be solved, okay? I mean, McCready could have joined her suit with the psychologists. But she was under no obligation to do it. The psychologists could have joined their suit to McCready. As between Judge Friendly and Justice Brennan opinions, you're going to get a little more headway with Judge Friendly opinions, is all I would say. I mean, there's a chapter on antitrust law, and that's a before case. But I don't think McCready's ever been overruled. No, you got me there. I guess the critical point here is, if you like the dissenters in McCready better, they didn't think there was any problem with the psychologists suing. Is this analogous to somebody providing services to the psychologists suing, not the psychologists suing? I would think the psychologists suing is analogous to the doctors suing. And your client provides services that are quite helpful to the doctors. So it's one step removed from the psychologists. It may be, but not a step that matters. Which is to say, if there was some powder that psychologists used, which was the critical thing that made them competitive all of a sudden, and there was a conspiracy to go after the powder manufacturer, then the powder manufacturer would obviously get to sue. And I think that their standing to sue would be much more obvious than McCready or like... What if the physicians had hired your employees? In other words, so they're not hiring your company, but they're hiring those individuals. Would the individuals have been able to sue, everything else being the same? In other words, they're losing their whole salary. They're getting their independent contractors with the physicians. This whole business model is blown up. Would they be able to sue? I mean, I think you'd probably at that point say, no, it's the company. I guess it depends a little bit who employs them. No, no, no, they're independent contractors. So the hypothetical is that they're not, your company doesn't exist. They have a service, they do at home, they do shots, they teach you how to do the allergy medications at home. The business is blown up, everything else is the same, would they be able to sue? I mean, if they were the targets of the joint boycott, if the whole thing was... Let's say they are, let's say they are. Then yes, I think so, I think so, but this is no revolution. The targets of a joint boycott have always been able to sue. And in a sense, they'll... That's an intent point. It is, and that's baked right into the five factors, and that's a legitimate factor under associated general contractors. Is it a factor in Illinois BRIC? No, it's not. The way I'm thinking about the case for what it's worth category is I'm with you on the five factors. If that's the way we think about it, I think you win. If it's an Illinois BRIC problem, I think it's really hard. That's how I see it. But it's not an Illinois BRIC problem at all. With all due respect, this is the simplest antitrust standing case ever. It's a joint boycott. Obviously you'll issue an opinion, you'll tell me differently, but there's just... When you are the target of a joint boycott... I'm asking you to focus on the things that I think are what's hard. I don't think the multi-factor stuff is hard. You caught me on that. I think the other stuff is a little harder. That's why I'm asking these variations on these questions. I agree. The multi-factor test I think is what took the district court astray. But I think if you look at this just as a matter of first principles, you go back to the idea that of course the target of a joint boycott could suit. That's always been the case. Like if you go all the way back, even before associated general contractors and circuit courts were trying to figure this out, they had a target test. Proximate cause still enters into the equation. It's not just butt floor plus intent. But when you're the target, essentially you can let the defendant's actions speak for themselves on probable cause. Judge Posner has an opinion, Motorola, where there was a cartel. It was an Illinois brick case, the cartel of the LCD screens, horizontal cartel, fixing prices, and the theory for why Motorola could sue rather than the subsidiaries who were the direct purchasers was that Motorola was the target. And Judge Posner essentially said if we adopt this target view of things, it's just going to overrule Illinois brick because every cartelist looks at the ultimate consumers as the target of their. But boycott is different, I agree with you. And I'm curious why boycott would be different than that hypo, if you understood what my hypo was. Totally understand. I think what Judge Posner is doing in that context is to basically explain why the target test can't be the sole test. Because if you apply it, I think the target test is inconsistent with Illinois brick because they are the sole test. Here the target is essentially to try to affect prices and so it's always about the consumer. Here, this really isn't about the consumer. This is about two entities at different levels that are fat and happy with the status quo. The allergists have a monopoly over providing the service, largely in the cities. And then you have insurance companies who, all things being equal, would like to not pay for this innovative new treatment that happens to be somewhat expensive. They only have a fixed pool of funds on this record, is that correct? With which to pay certain types of claims? Do you know? I don't think anything turns on that. Yeah, I know, it was just background. And I just leave you with the thought that I think maybe part of the problem with the five factor test is that it tries to be like an Uber test for every antitrust case. It's kind of like Lemon tried to be a test for every free exercise claim or religion claim. And it doesn't really work that way. But with all due respect, Illinois brick isn't a one size fits all for every antitrust claim either. And you should have a specific test for boycotts and it's an easy test. Of course the direct target test. I'll wrap myself in Judge Posner for these limited purposes. Is the Fifth Circuit going to have anything on this? Because it wasn't appealed? Was it briefed in the Fifth Circuit? It was briefed as an alternative ground by one of the three defendants to support the judgment below. But the fact that two of the three defendants didn't even think it was worth briefing as an alternative ground I think should tell you something. No, not really. All right, well let's hear from your co-counsel I guess are on the same side. Thank you, you'll get your full rebuttal. Good morning. As it relates to the state law claims, it's very similar in that the contractual relationship between United Allergy Services and physicians enabled allergy care to be offered in areas where it was not otherwise available. In rural areas like Fentress County, Tennessee where there's basically on the Kentucky border. The analysis by the District Court on tortious interference ignored all of that, especially as it relates to the defendant's efforts to break those contractual relationships. The defendants being fat and happy, as Mr. Clement mentioned, knew that they would be less fat and less happy if allergy services were expanded to places where people are paying for them but cannot access them. So what they did was came up with a scheme not to pay and to jointly recruit other insurers like Blue Cross, also not to pay, knowing that that would cause the physicians to not perform those services anymore, not pay UAS and not work with UAS any longer. Did they get all the relevant insurers involved in the boycott? I mean, that's, you know, like one counter to whether a boycott inflicts an antitrust harm is that sometimes some members of the insurance community are not aware of it. Sometimes members of that group break ranks and it just defeats the boycott and so the harm doesn't happen. Here, I guess we had like three insurers that are at issue. Is that somehow like, are they the only ones that matter for purposes of whether this group would have the leverage to force out a supplier like UA? In the state of Tennessee, there are three managed care organizations who administer Medicaid funds. All three agreed, if you see the evidence we cite in our brief, all three agreed on identical policies, all did without the directive of TennCare, all adopted identical caps. But most importantly, all three stated their position that they would target any home immunotherapy claims going forward as of 2019. That was sufficient to run UAS out of the state. That's the Medicaid patient universe we're talking about, and they're it. And they're it. And also, Blue Cross Tennessee, which in the state of Tennessee, like other states, unlike other states, owns 70 to 80% of the market. They are the giant on the commercial side. So having them in the mix pretty much makes it impossible. So whether you're the TennCare, whether insurance company, is it really tortious interference to just adopt a policy that we're not, we want to know about subcontracts or we want to know who else we're dealing with? That seems, whether it's good or bad as a matter of healthcare policy, it doesn't seem crazy to say, we're dealing with you. You're the one that's doing it. We want you doing it. We don't want someone else doing it. Doing that, you're unilaterally, Chief Judge Sutton, that's correct. But getting together and doing it not only violates the antitrust laws, that's unfair competition. That's that type of improper conduct. You're arguing tortious interference, right? That's correct, Your Honor. Well, that strikes me as not tortious interference. That strikes me as a debatable, contestable policy choice. Well, in terms of the malice element of tortious interference and the improper means element of tortious interference with relations, acting anti-competitively, contrary to how you would in a competitive market, is tortious interference if your goal is to disrupt a contract, to break that contract. That's exactly what they did. They knew that if they did not pay the providers for the services they were billing, those providers would turn around and not pay UAS. I found it remarkable that the district court said, well, proximate cause isn't an issue, because the providers could have paid UAS, but they did not. But that was the whole point. That was the breach of contract. If the breaching party is the end of proximate cause, you never have a tortious interference claim. But more importantly, the malicious element of it is how they describe it in their own e-mails as insurers, to flush UAS completely out of the state of Tennessee, to have secret meetings between Blue Cross and Amerigroup where they are seeking to eliminate UAS's services. They're asking Blue Cross to adopt the same rationale that they used to have on denying claims. And when Blue Cross would not do that, because it's not a subcontracted service, that's why they had to come up with identical policies going forward that make it clear they wouldn't pay. Those are the types of elements that, when aimed at a contract, are tortious under Tennessee law. And they're effective when they're carried out by insurers, especially the three insurers, the only three who administer Medicaid in the state, and the largest commercial insurer. To say there was no proximate cause here just defies the facts. And to say there's no malice or improper motive really just adopts their view of what the facts are. That's all the district court did. It just recitated the defendant's briefs on how they viewed the facts. Only for the contract with Amerigroup between a doctor. You have to tell us if you're going to subcontract the doctor's services to someone else. No, I'm making the point, doesn't that support the motive ruling below? That predated this. That was just in the contracts. That doesn't show whether it's anti-competitive, tortious, et cetera. If that's all they did, but then after that, they then went to recruit other insurers, and they also continued to deny after they were aware of the contracts, after TennCare declined to take any action on that basis, after the doctors were very clear as to what they were doing, and it was also very clear the doctors were only billing for the services they provided, not the services of UAS. Okay, thank you very much. We have two advocates here as well. May it please the court, William Sheridan for Apelli Amerigroup Tennessee. I'll focus primarily on the antitrust issues, and Mr. Winters will have the remainder of the time to cover the state law claims. You can do what you wish with your time, but I'd really think of spending some time in Illinois BRIC and Mr. Clement's responses to some of the points that were made there. So you can do five factors if you want. We'll keep listening or pretend to listen, but we'd really like to know something about Illinois BRIC. No, I completely, I picked up on that, Your Honor. I do think this is an Illinois BRIC problem. I think if there's time, I'd like to persuade you that the five factors have some wisdom, but I actually think the five factors in Illinois BRIC are connected. Associate General Contractors discussed Illinois BRIC, and I think what the five factors in Illinois BRIC show is that indirect victims of any antitrust conduct, any alleged anti-competitive conduct, do not have standing. Let's just stick with, I think what the other side would say is, how is it indirect when the whole point was to go after them? So what's indirect about that? It's true, part of the scheme involves other players, that happens, phones, there's lots of moving pieces in a scheme, but they would say it's just not indirect, right? Because they would say it goes after them, and then he pointed out if the physicians had done the suing, it did seem like a good point that his clients would not collect. In other words, they wouldn't get their profits. In other words, if they, let's say the physicians sued, they win, and then UAS comes in and says, hey, where's our take? That take is not going to be what they otherwise would have gotten. So that makes it not look derivative, or at least that's my head scratching concern. Right, and I think that's why the contractual relationships here are so important. UAS would have a remedy as against the physicians, because the physicians contract with UAS say that the physician will bill for the allergy testing and immunotherapy, and the physician will pay UAS, regardless of whether it's paid by Amerigroup or any other payer. Well, that's good as long as they have the contracts, but that gets shut down with the whole scheme, because the whole point is to get them out of the way. So now the contracts are gone. Well, I think it's important to look at the allegations and the complaint, and this was obviously dismissed on 12b-6. And interestingly, there are only two examples of Amerigroup seeking recruitment from physicians that were alleged. And in both of those examples, it's paragraphs 80 and 82 of the complaint, the physicians appealed under their contractual rights the efforts to recoup and succeeded in those appeals, and Amerigroup did not recoup any funds. So there's also no allegation that UAS doesn't operate in Tennessee. If you go on their website today, they still are able to operate in Tennessee. Is your take that if the physicians had brought the suit, then UAS would have gotten all of its profits? Is that your take, that it really is derivative? I think if the physicians brought the suit, and the physicians did, Dr. Sewell brought an antitrust claim alleging the same court conduct here. Those claims were dismissed for lack of evidence of agreement, and three months after the motion for leave to amend was denied, UAS filed a second suit. The hypothetical is the physicians bring it, it's every physician that's relevant, they win. Does UAS get, and is it truly derivative? That's what I'm trying to get at. You can say yes or no, but then explain it. I think it is not truly derivative. I think in that scenario, and I understand the issues there, the UAS's rights would still be under its contract, and I actually think that's what shows that this is indirect. Indirect in what sense? Indirect in the sense that the focus of all the conduct that's been alleged was on physicians. Amerigroup sent letters to physicians, investigated physicians, and this goes back to the five-factor test, but the district court recognized that intent and intent to harm UAS were not sufficient. So there's indirect as to the means by which they accomplish their aim, allegedly, which is to drive UAS out of the market. It is indirect because they work through the doctors, namely by refusing to reimburse them. But it is very much direct in the sense that that is exactly their object. It's not only, and that is their intent, it's their specific intent to have that result follow. And so why isn't that germane to causation here? Well, I think that does bring, somewhat has to do, but that goes back to the five-factor test. I'm not asking any questions. You want to talk five-factor test, talk about the one... I'm not asking about any five-factor test. He's asking about proximate cause. Right, so I think that there is, based on the allegations, intent, but the conduct was all directed at the physician. So I think you have to look at the anti-competitive conduct. I think that's the... So this, as it's alleged, is a boycott, it's what Bork would call a disguised naked boycott, if you ask me. Chapter 17, a boycott to drive a competing supplier out of the market, and they succeed. That is the allegation here. And how in the world is that not an antitrust injury? It gravely harms consumer welfare. People who previously were able to access more convenient, less expensive care, now have to go back to the less convenient, whatever, you get what I'm saying. So there's consumer harm, and they are driven out. Why isn't that an antitrust harm or an antitrust injury? When you look at Associated General Contractors, what it says antitrust injury is, and relying on Brunswick, is antitrust harm or injury is anything that would prevent consumers from getting competitive pricing and stop the competitive freedom of competitors. Well, there's... But patently, that happened, unless I'm grossly mistaken. I don't think the allegations dispute this, but Amerigroup and other payers benefit from price competition. You're getting into a whole other set of dynamics there. They also potentially get harmed by vastly increasing the number of claims for reimbursement. They might be a lot better off in a regime where they're paying a little bit more for a much smaller number of claims than they are where the price goes down somewhat because of competition in this very strange healthcare market. But now you've got way more claims. It's called reimbursement vulnerability, I believe, in the record. I mean, it's the defendants who are worried about that. Well, I think another important point from the record, an important context here is that Amerigroup is acting as a Medicaid MCO. It is working with TenCare to administer the Medicaid program. And as part of that, their medical loss ratio. So there are limits on how much cost containment Amerigroup can do. It has to pay 85 cents on every dollar of premiums on healthcare. So it does not have an unchecked incentive to reduce care. But I do want to get back to the boycott point, if I may, Your Honor. In Northwest Wholesale Stationers, the court found that even for a per se boycott, you need to allege that the members of the boycott have a dominant market position. And you asked that question. I think that's an important point. But they're the only Medicaid MCOs. And the important point is, you have to look at the alleged relevant market here, which is allergy testing and immunotherapy. It's not allergy testing and immunotherapy provided to Medicaid beneficiaries. So they do not allege that other commercial insurers besides Blue Cross Blue Shield of Tennessee were not reimbursing for this service. They do not allege that Medicare Advantage or the government through direct Medicare were reimbursing for this service. So they do not sufficiently allege that the alleged members of the boycott had market power. They also don't allege that they've been completely cut off from the ability to compete for the same reason. Can I ask you, why should corporate form matter? Would you concede if they had decided to take the defendant's model of employing physicians and so their physicians were contracting and submitting for reimbursement that they would have standing because the physicians would have standing? Yes, I think so. Why would we want to interpret the antitrust laws to incentivize one corporate form over another? Because if you are correct and they did that, they would get both the profits that they get from the physicians and the profits they get from this part of the package. But under your view of antitrust standing, the physicians would only get their profits and this part of the section because they're independent contractors rather than incorporated wouldn't get anything. So it's not obvious to me why we should interpret antitrust law doctrine to incentivize vertical integration rather than independent contracting. Well, I think those market realities matter in antitrust law. And I think here you had physicians could vertically integrate and they could sue under and Dr. Sewell did sue under the antitrust laws. And I think what then Judge Alito recognized in Barton Patino's and this was in associated to general contractors as well, you don't want a circumstance where a plaintiff who may have been the victim of anti-competitive conduct is left without a remedy. And here you don't have that. You have the physicians who did sue. But the point I was trying to make is wouldn't they be under wouldn't the harms be under compensated, so to speak, because they would only get their profits and that's all they could recover. UAS has their own independent profits. If they merged, both profits would merge and then they could sue and get both. But under your theory, they can get their profits and UAS gets nothing. I appreciate that, Your Honor. I think what I was going to get to is that the UAS can and did sue for tort interference, common law, state law, but in the vertically integrated scenario, they would have antitrust claims. Here I don't think they're left without a remedy. They still have a remedy under state tort law, state statute. And they pursued that remedy. You're doing the antitrust stuff. We went on that and my friend's got to deal with the state law claims. That's good. I appreciate your point about the relevant market and I'll look at the record as to what's alleged and so on. But if we set that to one side, it does seem that these three MCOs do have ample leverage to drive a supplier out of the market for Medicaid patients in particular. Isn't that true here? I don't know that that's true. I think the point is it's not alleged. Go ahead. How does the record show that they lack the leverage? UAS's CEO testified that Medicaid patients were unprofitable for UAS, that they served Medicaid patients to be good partners to their physicians, but they made the most money from commercial insured members. And so when you have an increase in the number of Medicaid members, the CEO's testimony was the profitability goes down. So I don't think any, and the court recognized this in the St. Luke's case, that Medicaid and Medicare often do not cover a provider's costs. They subsidize. So last quick question, just again on the issue of causation. The case law here says that we look at the common law for background principles of causation. And proximate cause is a doctrine obviously from the common law. But it's a doctrine that is employed under the common law to determine whether to assign harm to an actor who did not intend that harm. And it's a body of principles for determining when to assign liability nonetheless. The common law though also includes rules that assign liability when an actor intentionally causes a harm. He intends the harm and in fact causes the harm. If you read Holmes's common law, he talks more about that than he does about proximate cause. All under the common law. So why wouldn't we look at those common law principles as well to determine whether an actor who intends to cause a harm and whose actions are in fact a but-for cause of that harm, which is their argument here. That that actor should be found to have legally caused the harm. Because I think the associated general contractors went through all that background on the common law and distilled the common law and the causation issue into the five factors and it addressed intent and harm. And that was one factor. And here the court found there was intent to harm UAS and that's not sufficient. So the Supreme Court has... What was the last part? Hear the court? In the district court. That's what we're reviewing. Right. And there are other cases. In associated general contractors, the Supreme Court found that there was intent to harm the unions and harm to the unions, but that was not sufficient for standing. And may I also have the liberty of quoting Justice Holmes, who's also quoted in associated general contractors saying when it comes to damages, the tendency of the common law is to not go beyond the first step. Before you sit down, this is just a case law question. Illinois BRIC is usually a supplier cartel to a wholesaler, to a retailer. So that's the context. Do you know of any cases that have or have not expanded it to group boycott scenarios where you target one person and the way you harm that person is by harming intermediaries to get to that person? Is there any case law extending Illinois BRIC to that scenario? I'm not aware of any off the top of my head, but I would recommend you look at West Penn Allegheny Health System case in the Third Circuit, where the court said that there was an alleged agreement to eliminate an insurance product, and the court said there was no antitrust injury there because when suppliers are harmed, suppliers there where it was a hospital suing, they supply patients to the market for insurance products. That's a downstream market supplier, so that don't have standing to bring a claim there. All right. Thanks very much. Good morning, Your Honors. May it please this honorable court. My name is John Winters, and I represent the Allergy Asthma and Sinus Center, PME Communications, and the Delosiers, and my intention is mostly to speak about the state law claims, but I do want to ask or maybe respond to a couple of questions raised by Judge Kethledge, and one talking about the scope of the alleged conspiracy and whether all three MCOs would have the leverage to enact change. And I guess my response to that would be, first, United was not alleged in the complaint to be a party to the conspiracy, so that part's out. The second thing I would say is... Which United are we talking about here? United Healthcare, the MCO United. There's an MCO United, and then there's the commercial. The second thing I would say about that is, enrollees in the TennCare programs have the ability to change MCOs. So if I'm insured by Amerigroup and I don't like the services that Amerigroup is providing, I can change that to the Blue Care policy or to the United MCO policy. So I respectfully submit that that takes care of the issue that you were concerned about. So United is one of the three MCOs? Yes. You're saying that they're not alleged to have been participating? They're not alleged in the complaint. Okay. The second thing I would say is, you ask about whether there are other insurance companies who are alleged to be involved in the conspiracy. And what I would submit is, I couldn't find the page, but there's testimony from our brief from Dr. Klimico, who testified at the time that his contract was ended by UAS, not him. UAS because of lack of patient participation in the program. He was owed money by Cigna, Aetna, Blue Cross Blue Shield. Humana was another one, I believe. Their claim would seem to require particularized causation as to why an individual doctor ended his contract with UAS. It might be for reasons that doctor doesn't have any patients generally and it doesn't have to do with the boycott. And then going back to a point Chief Judge Sutton made earlier about, if it's a policy change, doesn't that preclude a finding of tortious interference? And I respectfully submit that the answer to that question is an unequivocal yes. All these policies apply to everyone the same. There are doctors who are providing these services and they apply to the allergist. So when the MCOs with 10 cares blessing was making these policy changes on the amount of units that could be billed, then that applied across the board to everybody, including the Allergy Asthma Center. I'm sorry to return you to the antitrust stuff, but I guess this is really for you and Mr. Clement. I'm just trying to think through, I listened to Mr. Clement's argument that, listen, UAS is not going to get fully compensated if all you have is the physicians. And then I'm just pausing for a second and just, okay, fine, that might prove it's not purely derivative. But what does the case law say? I don't think the case law says Illinois BRIC turns on whether everyone in the chain would get all their money if the first person sued. I guess I'm just, that's a question, I'm ignorant. Well, I'm glad you asked that question because I intended to cover that earlier without necessarily addressing the case law, but talking about the duplicative nature of the recovery. And what I would respectfully submit, if I'm a primary care physician and I'm providing allergy services, it's a formula. I provide these services. I send a statement to Amerigroup. I billed 150 units this month for 17 patients. It's a formula. They pay me for what I did. As a primary care physician, I'm responsible for paying UAS for the services they provided as a vendor to my facility. The primary care physician's charges aren't going to change if UAS can bring this lawsuit. The primary care physician's charges are going to be the same whether UAS files this lawsuit or not. Do those charges incorporate the cost of the technician work and the cost of the vial? It's all inclusive. So they're actually paying for that stuff. That's exactly right. It's almost like rent. Well, you could look at it that way, I think. That's fair. They're seeking prospective relief in the sense of lost future profits, right? They've certainly made a claim for that. As to those, we are talking about non-duplicative recovery. It's the doctor's profits, lost profits, and it's UAS's lost profits. The latter is not subsumed in the doctor's profits. Well, I'll give you an example. Dr. Sewell, he had two theories that he made a claim against Amerigroup. One was breach of contract, one was the antitrust claim. He was asking to recover for the amount that he believed that Amerigroup should have paid him for the services that were provided through his office. Not just lost profits, the entire relief. That was his allegation. We had to shut this whole thing down because the boycott was successful. For each of these actors, they only get their lost profits. It's not just for employee expenses that they never incurred in the future. It's just the profits they don't get. Those respective damages for these two different actors are not at all duplicative. Totally different buckets of money. We're not ladling out of one bucket to the downstream person. What I respectfully submit is UAS is making claims for both future profits and lost back profits. In the sense that they're making a claim for lost back profits, the loss would be duplicative. I understand your argument. If you had an indispensable point, we'll hear it. Thank you. Just a few points in rebuttal. United is not a defendant, but they are alleged to be part of the conspiracy in the complaint. Just because you don't make them a defendant doesn't mean they go away in your allegations. Also, the Blues have settled here. In the original complaint, both Blues entities were named, and that included the commercial market as well as the three actors and the MCOs. Does the complaint allege market power? Yes, it does allege market power, but keep in mind that that's really only relevant as to the conspiracy between the allergists and the insurers. As to the insurers or the MCOs, it's a horizontal group boycott. You don't need market power for that. On the Illinois BRIC issue, with all due respect, I don't think Illinois BRIC ever purported to be a general rule for antitrust standing. Illinois BRIC was on the books when AGC and McCready were decided. Those were more like boycott cases, and they just didn't run them through the lens of Illinois BRIC. And the reason I think it's ultimately unhelpful to do that is because, and I think this is the point that Judge Kethledge was making by invoking Judge Posner, the classic Illinois BRIC case is an overcharge case, and it's one overcharge. And of course you don't want two people to be able to recover the same overcharge, or you don't want to get into some collateral discussion about who actually gets more profit as to that one overcharge. But that's not what we have here. These are different streams of profit. I think it's true all the time, but I agree with Judge Kethledge. It's easier to think about when you think about it prospectively. If we're out of this market, we lose our... I think it's helpful to use the example. Suppose there's a branded pharmaceutical that's expensive. There's a generic or an off-label use. Most doctors would prefer to use the expensive, branded, innovative drug. But if the insurers get together and conspire and say, no, you've got to do the generic or you've got to do the off-label use. The doctors may not be out anything. They may get the same five bucks for administering the generic or the off-label as they get for the branded. The branded pharmaceutical company is devastated. They lose huge profits, and they're the direct target of the group boycott. It just doesn't make any sense to not say they're not the perfect person to sue. So if I can move on to this question just about corporate form that you raised, Judge Murphy. I just want to emphasize how important that is, because if you think about the modern world, most of the innovative, disruptive companies that come into a market are innovative or disruptive, in part because they have a different model. They're not like the taxi company that owns the dispatchers and the cars and all of that. It's just Uber, and they just have a piece of it. They don't have the whole thing. They don't own the cars. But boy, if I were all the taxi companies and I could get away with conspiring to keep Uber out of the market, because it's only one piece of the diversified chain that I have, I'd love to do that. But I can't do that. That's a classic group boycott. And the fact that they have a slightly different sort of corporate structure or come at it slightly differently is what's disruptive. It would be crazy to say the very thing that is disruptive is the thing that costs you antitrust standing at the threshold. The other point I would just make here before I sit down, and I will sit down in just a second, is that, and this is really on the tortious interference point. I mean, Chief Judge Sutton, you made a point about, well, if the only thing in this case were the initial sense that, hey, maybe you're using a subcontractor here, and we want to sort of get to the bottom of that, I mean, so be it. But the record evidence shows that Amerigroup wanted to quote, unquote, flush us out of the market. Now, flush us out of the market is a way different situation from, hey, we want to make sure you're not using a subcontractor. Of course, if this goes in front of a jury someday, they're going to get up there and they're going to say, hey, we did all of this with the best of intentions. We thought they were subcontracting. We were a little worried about some kind of fraud, waste, or abuse. We're going to come back and say, look at their emails. They weren't talking about waste, fraud, and abuse. They were talking about flushing us out of the market. They want to rely on TenCare, and TenCare made us do some of this stuff. And we have evidence that specifically says that even after TenCare looked at this and said there's not a problem, that they continue to agree on not just sort of getting flushing us out of the market, but the exact mechanism to do it, what codes to use, how many units to reimburse. So we're happy to litigate this case in front of a jury, but of course we report out on antitrust, on the threshold of antitrust standing, which I continue to think is just horrifically wrong. And then we report out on summary judgment based on things that I think fairly are understood as judgment calls for the jury. Real quick, we decide the antitrust issues on the pleadings here, not on the summary judgment record. Is that right? That's absolutely right. And I suppose it's within the realm of possibilities that my friend on the other side can file a summary judgment motion. There will probably be some dispute about whether we get extra discovery, but it's just the pleadings. All right, thanks to all four of you for your super helpful briefs and arguments. Above all, for answering our questions, which we're always grateful for. So thanks to all of you. Really appreciate it. It's a challenging case. The case will be submitted and the clerk may call the last case.